**GULF, COLORADO & SANTA FE RAIL-
WAY COMPANY, Appellant,**

v.

**Earl R. DEEN, Appellee.**

**No. 3135.**

Court of Civil Appeals of Texas.

Eastland.

Feb. 4, 1955.

Rehearing Denied Feb. 25, 1955.

Woodruff & Holloway, Brownwood, Hudson, Keltner & Sarsgard, Ft. Worth, for appellant.

McCord, Durant & Witts, Robert Lee Guthrie, Dallas, for appellee.

**GRISSOM, Chief Justice.**

On July 12, 1949, Earl R. Deen had his leg broken by babbitt falling from a melting pot and he sued his employer, the Gulf, Colorado & Santa Fe Railway Company, for damages under the Federal Employers' Liability Act. See 45 U.S.C.A. § 53. Deen had then been employed by said company as a coppersmith in its roundhouse in Brownwood for eleven years. The company kept there a babbitt melting pot which had cracked and was no longer usable. The railway company had ordered a new pot. On the morning of July 12th, Deen's foreman advised him there was an engine in the roundhouse which had to be repaired that day. Deen was working on said engine when the clerk of said company's store department told him the new pot was on the way to the roundhouse from the depot. Deen left the engine, moved the old pot to the floor and was attempting alone to dump the babbitt out of the pot when a blacksmith, Snow, saw Deen and volunteered to help. Snow and Deen tried to dump the pot "away" from them but it was too heavy to tilt the pot forward without more help and they then pulled the pot toward them and the babbitt fell forward from the pot and broke Deen's leg. Deen did not ask for any help. Three times within the preceding

three weeks, Deen, with the assistance of sufficient help, had manually removed the babbitt without anyone being injured. There were about sixty other men employed in Deen's department of the railway shop. His employers were not advised that he was then going to do such work, nor how he proposed to do it, but Deen voluntarily attempted to do it alone and then, after Snow volunteered, he proceeded to remove the babbitt with only the assistance of Snow.

Deen alleged it was necessary, if said engine was to be repaired that day, that there be no delay in installing the new melting pot and that it was his duty to get the old pot off the furnace and remove the babbitt; that he moved the pot from the furnace to the floor; that the pot weighed about 250 pounds and the babbitt and pot together weighed about 800 pounds; that to get the babbitt out of the pot it was necessary to raise the pot on its edge so the babbitt would fall out; that the railway company knew, or should have known, that the old pot had to be moved and the babbitt taken out and, therefore, it was its duty to furnish Deen with proper tools with which to take the babbitt out of the old pot, or to furnish *"sufficient help to remove such babbitt without the use of tools"*; that Deen knew the babbitt could not be removed without tools to grasp the pot and give sufficient leverage to turn the pot over, or *"that he have sufficient help to tip the edge of said pot over and turn the same in the direction away from the plaintiff"*; that plaintiff procured the help of one man, Snow, to turn said pot over and dump the babbitt; that they attempted to turn the pot over by raising it on its edge and tilting it *"away from them"* but, because of its weight, they could not do so; *"that because of the lack of sufficient help or sufficient tools,* it then became necessary for the plaintiff and the said Snow to grasp said pot upon its edge and pull same *towards them* in order to turn the same over"; that when they tilted the pot toward them the babbitt fell toward Deen and struck his leg. *"That had the plaintiff had sufficient help, to-wit: at least two other persons, to assist*

*in turning said pot over, the same could have been done by lifting the same and turning it over away from the said plaintiff and the said Snow, but because of the negligence of the defendant in failing to furnish sufficient help or sufficient tools"* Deen was injured. (Emphasis ours.) Defendant answered, among other things, that Deen decided when and how this should be done and that he acted without instruction as to how it should be done; that Deen did not ask for additional help nor for instructions; that the method used was decided by Deen alone and, if there was negligence in the amount of help used or the manner in which the work was done, said matters were determined solely by Deen and his injury was the result of his own negligence.

A jury found (1) the railway company failed to furnish Deen with proper tools to remove the babbitt and (2) that such failure was negligence and (3) a proximate cause of Deen's injury; that (4) defendant did not fail to furnish one or more men, in addition to Snow, to assist Deen in removing the babbitt from the melting pot; that (7) the railway company did not fail to give Deen proper supervision; that (10) Deen was negligent in failing to obtain additional help to do the work he was doing when he was injured and that (11) Deen's said negligence was a proximate cause of his injury. The jury found that (13) Deen was not negligent in the manner and method used in doing the work; that (15) the railway company and its supervisory employees should have reasonably anticipated that Deen would perform the work which caused his injuries in the way and manner in which he did; that (16) the sole proximate cause of Deen's injury was not "due to" his acts and conduct; that (17) $39,000 would compensate Deen for his injuries but that (18) said amount should be reduced 45%, or $17,550, by reason of Deen's negligence. Judgment was rendered on said verdict awarding Deen $21,450 and the railway company has appealed.

The principal question presented is whether there was evidence to sustain the finding that the railway company was

negligent in failing to furnish Deen with tools to remove the babbitt from the melting pot. Deen was furnished a revolving hoist and chains with hooks which he used to move the melting pot from the furnace to the concrete floor. His injury was caused by the falling of the babbitt from the pot while he and Snow were trying to get the babbitt out by tilting the pot "toward" them, instead of "away from" them, after the pot had been moved from the furnace to the floor. Appellant contends it had no duty to furnish more than one reasonably safe way to do the job; that the babbitt could have been removed with reasonable safety by the use of the additional help available and that the jury's findings and the undisputed evidence so show.

The melting pot was described by Deen as being about nine to ten inches deep, forty inches long and twenty-two inches wide. It was slightly wider at the top than the bottom. It resembled a kitchen sink. The pot weighed about 250 pounds and it and the babbitt therein weighed about 800 pounds. The pot had an outside rim around its top 1½ to 2 inches wide.

Deen's complaint was, in substance, that it was the company's duty to do one of two things, either furnish tools or additional help to remove the babbitt. Deen seems to recognize in his pleadings the correctness of appellant's proposition that the company did not have a duty to furnish more than one reasonably safe way to do the work.

■ We shall now attempt to determine the correctness of appellant's contention that the verdict and the undisputed evidence show that the babbitt could have been removed with reasonable safety with the additional help available to Deen. If this contention is correct, the railway company had furnished one reasonably safe way to do the job and it had no duty to furnish a second reasonably safe way, that is, to furnish Deen with tools. In other words, if there was no need for tools the railway company had no duty to furnish them. Western Union Telegraph Co. v. Coker, 146 Tex. 190, 204 S.W.2d 977, 979.; Louis-

ville & N. R. Co. v. Davis, 6 Cir., 75 F.2d 849; August v. Texas & N. O. R. Co., Tex. Civ.App., 265 S.W.2d 148, 153 (RNER); Armstrong v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 233 S.W.2d 942, 946 (RNRE); Wolfe v. Henwood, 8 Cir., 162 F.2d 998, 1000; Fore v. Southern Ry. Co., 4 Cir., 178 F.2d 349, 351; McGivern v. Northern Pac. Ry. Co., 8 Cir., 132 F.2d 213, 217; Thomson v. Pennsylvania R. Co., 6 Cir., 88 F.2d 148, 150; Johnson v. Pulliam, Tex.Civ.App., 161 S.W.2d 589 (RWM).

As heretofore shown, the jury found the railway company did not fail to furnish more men to assist Deen in removing the babbitt; that it did not fail to give Deen proper supervision at the time of his injury; that Deen was negligent in failing to obtain additional help to remove the babbitt and that such negligence was a proximate cause of his injury. We think said answers, considered in connection with the record, must be construed as a finding that sufficient men were available to help Deen remove the babbitt with safety. If it does not include a finding that the babbitt could have been thus removed with reasonable safety, we need only to further determine whether the record shows that if Deen had used sufficient help the babbitt could have been manually removed with reasonable safety. It is undisputed that several times recently before Deen's injury, he, with sufficient help, had manually removed the babbitt without injury. Deen pleaded that it was the company's duty to either furnish tools or additional help and the jury found that additional help was furnished and Deen was negligent in not using it. It is shown by Deen's testimony that if the babbitt could have been emptied by turning the pot away from, instead of toward, the men doing the work it could have been manually done with safety. The record shows that with sufficient help the babbitt could have been manually removed from the pot with reasonable safety by tilting the pot away from the men doing the work. The testimony of Deen and his witnesses are conclusive on this question. The following testimony of

532

Deen and his witnesses show the situation existing when Deen was injured and requires said conclusion. Mr. Deen testified:

"A. Mr. Earl Snow, who was working at a blacksmith job—came over and said, 'Maybe I can give you a lift' or in some way he remarked that maybe he could help me, and I said, 'Well, lets see if we can turn it over away from us' and we tried to turn it *away from us,* but we couldn't. And I said, 'Well, maybe we can pull it *toward us,* if we can brace ourselves, you can brace there on the work bench, or work table that we have here, and I will brace on the furnace', and so we braced ourselves, tried it and gradually came up with it; but it was very slow because we were over-powered to start with, but we managed to get it up about straight, on its side, and I wouldn't say that I did, but one of us remarked—I think that I was the one that mentioned it to look out that thing sure would mash your toe.

\*    \*    \*    \*    \*    \*

"Q. *Could it have been turned away from you if you had* had more man power? A. *I don't see why it couldn't.*

"Q. How many additional men would you say it would take? A. How many—

"Q. *How many additional men to turn that pot by lifting it away from you?* A. *One good man, anyhow.*

\*    \*    \*    \*    \*    \*

"Q. Now, all right, on this particular occasion, did you request any help in lifting this pot? A. No, sir.

\*    \*    \*    \*    \*    \*

"Q. Well, from the time you first noticed—I am not talking about the time of your last batch, but from the time you first got it cracked until the time you got hurt, it had been some two or three weeks, had it not? A. Yes, sir.

"Q. During that time, you and others had taken it out of there—out of the furnace, on the ground there, and taken the babbitt out, and brazed it, one or more times? A. Yes, sir.

"Q. About three times, wasn't it? A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. Now, Earl, I will ask you if that pot, babbitt pot, and the removal of it was your job? A. Yes, sir.

"Q. And, were you a full rated man, getting the maximum rate for your job? A. Yes, sir.

"Q. In doing the work out there, I will ask if you or any full rated man was expected to know pretty well how to do the job? A. Yes, sir.

"Q. All right. As far as getting that pot out, who was in charge of that? A. I was.

"Q. Did the foreman tell you to take the pot out? A. No, sir.

\*    \*    \*    \*    \*    \*

"Q. All right, but any way, as far as this particular job was concerned you were just told by the clerk,—Mr. Bettis, I believe it is? A. Yes, sir.

"Q. That it was—or that the new pot had come in? A. Yes, sir.

"Q. And that they—the Store Department had gone after it in a truck? A. Yes, sir.

"Q. And nobody told you, none of the supervising employees, Williams or Johnson, or anybody else, told you how to do that job, did they? A. No, sir.

"Q. Whose responsibility was it to do the job? A. Mine.

"Q. Who decided it was going to be done at that particular time? A. I did.

"Q. Who decided as to whether you were going to do it by yourself or to go ask for help? A. I did.

"Q. There were men around there that could have been found to help you, weren't there? A. I suppose they could, but I had asked so many times and they hadn't been.

\*　　\*　　\*　　\*　　\*　　\*

"Q. All right, next question: 'Well, did you go and ask him for some help? Answer: 'No, sir.' Did you say that? A. I did.

"Q. Question: 'There were men working there that you could have had assigned to help you, were there not? And you answered 'Yes, sir?' A. Yes, sir.

"Q. Did you say that? A. Yes, sir.

"Q. Is that true? A. Yes, sir.

"Q. Next question: 'And you did not ask for more help?' Answer: 'Not on that particular job, no sir.' Was that your answer? A. That's right.

"Q. Next question: 'You had not discussed that particular job with the foreman at all?' Answer: 'No, sir.' Did you say that? A. Yes, sir.

"Q. And was that true? A. Yes, sir.

"Q. All right. Then 'There were some men reasonably close the foreman could have assigned to help you?' A. Yes, sir, but I don't know whether he would or not.

"Q. Anyway, you didn't ask him and have him refuse? A. No, sir.

"Q. Now, getting back to getting that pot out, I think you had taken it out about three times before in the past two or three weeks, had you not? A. Something like that.

"Q. You knew how to handle that job, didn't you, Earl? A. I thought I did.

"Q. Was there anyone out there that knew more about it than you did, or who had taken it out more times than you had? A. No, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. All right; let's just take them one at a time: The decision as to when to take it out; who made that decision? A. I did.

\*　　\*　　\*　　\*　　\*　　\*

"Q. All right, now, Earl, if I misquote you, please tell me; as to getting that babbitt, so far as that is concerned, you might have been able to break it with a sledge hammer or some other way, but *you figured that the safest way was to turn it over?* A. *That's right.*

"Q. All right; whose decision was that? A. I don't remember, but as well as I remember, we both talked about it.

"Q. Who talked about it? A. Me and Earl Snow.

"Q. Well, Earl, who was in charge of removing that pot and babbitt, you or Earl Snow? A. I was.

"Q. Well, anyway, *you agree that is the best way to do it, don't you Earl?* A. *Yes, sir.*

"Q. All right. Now, incidentally, after you got that old babbitt pot out, the furnace was empty where you could put the new one in it, wasn't it? A. Yes, sir.

"Q. There wasn't any hurry about getting the babbitt out of the old pot right then, was there? A. Nothing more than it had to come out, if the engine was got out that day.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Are you telling this jury right now—if you don't know, tell me you don't know; but are you telling this jury right now there was not plenty of babbitt out there besides what was in that pot on that day? A. I don't know that there was.

"Q. Well, you don't know whether there was or wasn't, Earl, is this just about the truth, you were going to have to do it sooner or later, and you were there waiting on the truck, and you just decided to do it then? A. That's right.

"Q. All right, now, whose decision was that? A. Mine.

"Q. The foreman did not tell you to do that at that time? A. No.

\* \* \* \* \* \*

"Q. So, turning it over is what you had done on the other occasions to get the babbitt out? A. That's right.

"Q. All right. And the pot weighed the same, didn't it? A. Yes, sir.

"Q. And the—was there ever that much babbitt in it before? A. Yes, sir.

"Q. All right. How many men did it take to turn it over the other times? A. Four or five, or five or six ahold of it; I have had as many as six ahold of it.

"Q. Did anybody know that any better than Earl Deen? A. No, sir; I don't suppose they did.

"Q. And on the other occasions, during the past two or three weeks, when you changed it out, you had as many as five or six men helping you? A. Yes, sir.

"Q. All right. Nobody refused to let them help you, did they, Mr. Deen? A. No, sir; I caught them when they was right there available, and I asked them and they helped.

\* \* \* \* \* \*

"Q. There wasn't anything wrong with that operation out there that day, outside of your foot being in the way when that babbitt fell out? A. So far as I know.

"Q. There wasn't? A. That's right.

\* \* \* \* \* \*

"Q. Now, Mr. Deen, with reference to lifting this pot the way that you did, you did demonstrate to the jury the way you and Mr. Snow *got in front* of it and braced yourself with one hand and *pulled it toward you*? A. Yes, sir.

"Q. Was there any other way to lift that pot and to turn it that way, that is, for two men to do it other than that way? A. *Two men was overloaded* in doing that and we had tried before to turn it *away from us* for safety measures.

"Q. And is that why you had to get in front of it? A. That's true with only two of us were able to pull more than we was able to lift and push.

\* \* \* \* \* \*

"Q. Question 77: But *you knew that you would get help sooner or later to get it down.* And you answered: 'Yes, sir.' Did you make that answer? A. Yes, sir.

"Q. Was that true? A. Yes, sir.

"Q. *You did know that you would get help sooner or later?* A. Yes, sir.

"Q. In other words, you knew that they were not going to let this furnace be shut down indefinitely waiting to get the new pot installed? Answer: 'They never have, but sometimes it looked like we was going to have to go to town and get help' did you answer that? A. Yes, sir.

"Q. Next question: What I am getting at is this: If you had not done it at that particular hour or minute, and let the pot go up to the warehouse, you would still have had to go through the same procedure, that is, you would still have had to take the old pot out and put the new one in, and you answered: 'Yes, sir' did you make that answer? A. Yes, sir.

"Q. Did you say that? A. I sure did.

"Q. In other words, it would have meant a few minutes, or the difference would have been the delay in getting help; is that right? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. When I asked you about designing something, all that you could think of was the clamps and that would be dangerous, wasn't that your testimony? A. Yes, sir.

"Q. And yesterday you testified that you had moved that pot several times? A. Yes, sir.

"Q. And that you knew more about moving that pot than anybody in the shop; now, do you wish to change that? A. I don't think I said I knew more about it than anybody in the shop.

"Q. I believe you said you knew as much about it as anybody in the shop? A. Well, let it go at that.

\*   \*   \*   \*   \*   \*

"Q. Now, Mr. Deen, if you had had another man or two men more to help in lifting that pot, would your foot likely to have been in the position it was when injured? A. If I had had enough help, I would have turned it away from me."

Plaintiff's witness Snow testified:

"Q. Now, with reference to trying to move that pot and trying to empty the babbitt from it *away from you,* could three men have done that job? A. I suppose they could have, maybe.

"Q. Could four men have done it? A. Well, that might be possible, but I don't know whether four men could get to it or not, maybe they could have and maybe they couldn't.

"Q. Could three men have done the job with more ease than two men? A. Yes, sir; I suppose three men would have been better on the job.

"Q. *Could three men have turned it over away from you so the babbitt could fall out?* A. I think so.

\*   \*   \*   \*   \*   \*

"Q. All right. Now, one more question: if you or he had thought it was necessary, could you have gone to the foreman and asked for some more help there? A. Yes, sir.

"Q. Were there men available in that same general area—I don't mean men within ten feet—but men in that general area available to be assigned, or could have been assigned to help you? A. Yes, sir.

"Q. All right. And all it would have caused would have been a delay? Delay getting the job done, is that right? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. Now, Mr. Snow, if you had a third man, you would have been behind the pot, would you not? A. I, myself?

"Q. Yes, sir. In other words, if you had had a third man you would not have all three been in front of it, would you, Mr. Snow? A. No, sir; I wouldn't think so.

"Q. Because with a third man, you could have moved it over *from you,* and dumped the babbitt out, could you not? A. Yes, sir; I think so. * * *"

Plaintiff's witness Anderson testified:

"Q. And you know, do you not, Mr. Anderson, that Mr. Deen, in the preceding couple of weeks, had taken that pot out two or three times to braze it; you know that, don't you? A. Yes, sir.

"Q. And put it back? A. Yes, sir.

"Q. And you know, do you not, that he did it with the same equipment that was out there and used on July 12, 1949, don't you? A. Yes, sir.

"Q. All right. And he had gone through exactly the same operation

that he had gone through on these other occasions? A. I reckon.

"Q. All right. And you also know that nobody got hurt doing it, don't you? A. Yes, sir." (Emphasis ours.)

We conclude that the verdict and the undisputed evidence show that with the use of the additional help available the pot could have been tilted away from, instead of toward, the men doing the work and the babbitt thus removed with reasonable safety. The testimony of Deen and his witnesses is to that effect. It is undisputed that the babbitt had been thus safely removed three times in the two or three weeks preceding Deen's injury. Deen alleged it was defendant's duty to either furnish tools or sufficient help. His case was submitted to the jury on that theory. Deen thus assumed that if sufficient help had been furnished the babbitt could have been manually removed with safety. Sufficient help was available. See Western Union Telegraph Co. v. Coker, 146 Tex. 190, 204 S.W.2d 977, 979. Under Deen's pleadings and the law, defendant was not required to do both. With sufficient help the babbitt could have been dumped manually with reasonable safety, therefore, there was no need, hence no duty, to also furnish tools. Furthermore, there is no evidence that the additional tools suggested by Deen and Snow were in use, safe or approved. They had not thought of them before the accident. Deen testified that the clamps suggested would have been dangerous. They testified that the only way the babbitt could have been safely removed was either with their suggested appliances or manually, with adequate help. Deen testified the safest way was to tilt the pot and let the babbitt fall out. Deen and his witnesses agree that with sufficient help the pot could be tilted away from the men doing the work and the babbitt removed with safety. We sustain appellant's contention that the evidence does not support the finding that defendant was negligent in failing to furnish tools. The defendant was not negligent if it provided the necessary help and Deen voluntarily proceeded to do the work without using it. There were about 60 men working in his department. Deen started to do the work alone, without seeking any assistance and without instructions to do the job then or without help. Snow volunteered to, and did help. Deen had done the same job three times before, in the same way; on those occasions he asked for and obtained adequate help and no injury was suffered. Western Union Telegraph Co. v. Coker, 146 Tex. 190, 204 S.W.2d 977, 979. Deen alleged appellant's duty was to either furnish tools or sufficient help. He was required to prove that defendant did neither. There being a reasonably safe way to dump the babbitt without tools, appellant had no duty to furnish them for that purpose. Judgment should have been rendered for appellant notwithstanding the finding that appellant was guilty of negligence in failing to furnish tools. This decision renders unnecessary a consideration of the other points presented by appellant.

The exceptions stated in Texas Rules of Civil Procedure, rule 434 are not applicable to this record and we are required to render the judgment the distinguished trial court should have rendered. R.C.P. 434; London Terrace v. McAlister, 142 Tex. 608, 180 S.W.2d 619; Yarbrough v. Booher, 141 Tex. 420, 174 S.W.2d 47, 150 A.L.R. 1369; Lone Star Gas Co. v. Kelly, Tex.Civ.App., 166 S.W.2d 191.

The judgment is reversed and judgment rendered for appellant.