383 So.2d 397 (1980)
Curtis BAILEY, Plaintiff-Appellee,
v.
MISSOURI PACIFIC RAILROAD CO., Defendant-Appellant.
No. 7451.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1980.
Rehearing Denied May 5, 1980.
Writ Refused June 13, 1980.
*398 Anderson, Leithead, Scott, Boudreau & Savoy, Everett R. Scott, Jr., Lake Charles, for defendant-appellant.
Perrell Fuselier, Oakdale, for plaintiff-appellee.
Before CULPEPPER, GUIDRY and DOUCET, JJ.
GUIDRY, Judge.
This is an action brought under the Federal Employers' Liability Act, 45 U.S.C. Sec. 51[1] et seq., for injuries alleged to have been *399 sustained by the plaintiff as a result of defendant's negligence. Plaintiff-appellee, Curtis Bailey, alleges that defendant-appellant, Missouri Pacific Railroad Company, negligently required him to perform tasks normally assigned to more than one person under such conditions so as to cause him to suffer a heat stroke. Plaintiff further alleges that as a direct result of the heat stroke he subsequently suffered a myocardial infarction which left him permanently disabled. Defendant denied any negligence on its part and pled alternatively plaintiff's independent negligence and contributory negligence in diminution of plaintiff's claim for damages.[2] The matter was tried without a jury. The trial judge in his written reasons concluded as follows:
"A. Defendant was negligent in requiring the plaintiff to perform a two man job alone considering his age and the weather conditions.
B. This negligence caused the plaintiff's heart attack and resulting damages.
C. It was forseeable considering plaintiff's age and weather conditions that he would suffer some sort of collapse similar to that which he experienced as a result of this increased activity under the circumstances.
D. Plaintiff was not negligent in performing the task assigned to him which caused his collapse. He could hardly refuse to do the work he was instructed to do. The remaining crew members had other tasks to perform and could not help him. He could not procrastinate because trains periodically used that section of track. There was apparently no other way for plaintiff to perform the work assigned to him other than the way he did. It is therefore the opinion of the court the plaintiff is entitled (sic) damages against defendant undiminished by any negligence on the part of the plaintiff.

 DAMAGES
1. Loss of Earnings to
 date of trial $ 35,565.54
2. Loss of Future Earnings
 (To age 65) 30,000.00
 _________
 Total Special Damages 65,565.54
 Pain, Suffering, and
 Emotional upset, past,
 present and future,
 and loss of enjoyment
 of life 50,000.00
 ____________
 Total damages $115,565.54"

Accordingly, judgment was granted in favor of plaintiff and against defendant; condemning defendant to pay to plaintiff damages in the amount of $115,565.54. Defendant appeals and asserts that the trial court's findings are unsupported by the testimony and evidence adduced at trial and urges reversal of the lower court judgment. We disagree and affirm the trial court judgment for reasons which follow.

FACTS
The record shows that on the morning of June 30, 1975, plaintiff was employed by defendant as a Helper on a Bridge and Building Gang (B & B Gang). Plaintiff was 58 or 59 years old and had been working *400 for defendant for over thirty years. The B & B Gang to which plaintiff was assigned consisted of five men: Ronnie Latiolais, Foreman; Robert Duran, Assistant Foreman; Jack N. Fontenot and Ira E. Fuselier, Sr., Carpenters; and plaintiff, Helper. As helper, plaintiff assisted generally in the B & B Gang's operations and in particular, was the "crab" operator. The "crab" is a small motorized crane mounted on a small non-motorized platform car. One of the functions of the crab is to move cross-ties from a storage area along the railroad tracks to the point where the ties are to be installed and when used thusly, is a two-man job: one to operate the crane; the other to secure the cables around the ties to be moved; and then both to assist in rotating the loaded crane's boom and pushing the crab along the track. On June 30, 1975, plaintiff was required to operate the crab without a helper as the crew was shorthanded. Ira E. Fuselier, Sr., who normally assisted plaintiff in operating the crab, was on vacation.
The sequence of events on the Monday morning of June 30, 1975 are as follows: Plaintiff's B & B Gang started work at 8:01 A.M. at the railroad's Bridge No. 630.5, north of Oakdale, Louisiana. The weather was hot and humid. The crew had a stop order out and flags were set up on the track to inform trains of their presence. The crab was moved onto the tracks from a set-off and the gang began pulling spikes out of the railroad ties in the bridge that were to be replaced. The replacement ties had been stacked about 125 feet north of the bridge the week before in preparation for this work. Plaintiff's work as crab operator after the first set of spikes were pulled consisted of pushing the crab along the track to the stack of ties; manually rotating the crane's boom to a position over the ties; securing the winch cable around six cross-ties (each weighing 150 lbs.); manually rotating the boom back parallel to the tracks; pushing the loaded crab back to the bridge; and, finally, operating the boom to position the replacement ties for the other members of the gang to slide under the rails into position on the bridge. After making two such trips, plaintiff went back for his third load between 8:30 and 9:00 A.M. and was in the process of getting onto the crab to boom up the replacement ties when he collapsed. After a delay of approximately 30 minutes, plaintiff was taken by Robert Duran to the Mowad-Nesom Clinic in Oakdale. Plaintiff was examined and treated by Dr. George B. Mowad, who diagnosed plaintiff's condition as a classical case of heat prostration. Plaintiff was hospitalized the same day at Oakdale General Hospital. Sometime during the night of July 1 and/or the morning of July 2, 1975, while still being treated for the effects of the heat stroke, plaintiff suffered a myocardial infarction. On July 4, 1975, plaintiff was transferred to the St. Francis Cabrini Hospital in Alexandria, Louisiana, where he remained under the care of Dr. M. L. Godley, until he was discharged to return home on July 24, 1975. As a result of plaintiff's heart attack, he is permanently disabled from performing his job with defendant and is, and will continue to be, highly restricted in his physical activities. Further, plaintiff will be required to take medication for the rest of his life to prevent heart failure.

MEDICAL EVIDENCE ON CAUSATION
The medical evidence presented at trial consisted of the depositions of the two physicians who treated plaintiff for his heat stroke and heart attack: Dr. George B. Mowad and Dr. M. L. Godley. In reference to the cause of heat strokes in general, Dr. Mowad explained as follows:
"... Anything that would cause an increase, cause an increased amount of activity, regardless of what it is, in the sun, that would cause an increased amount of oxygen requirement by the body could cause more of a strain, whether be it a stroke or whatever it is. There's more likelythe more hotter you get, the more work you do in the heat, the more likely you are to have a heat stroke, be it this work or whatever work it is. (P-5, page 15)

* * * * * *
*401 ... As a general rule, in the majority of the cases, you don't see heat strokes unless there is some change in the normal work patterns of a person. Either it gets unusually hot, or unusually hot with humidity or there's an increase in the work load. These are the things that usually create these stokes (sic). It's unusual to see a person doing his usual job under the samethe average set of circumstances have a heat stroke." (P-5, page 38)
Dr. Mowad also stated in his deposition that the stress on the heart is increased with the severity of the heat stroke. Dr. Mowad rated plaintiff's heat stroke to have been moderate to severe.
Dr. Godley, a cardiologist and specialist of internal medicine, was plaintiff's treating physician for his heart attack. When asked if he had formed an opinion as to whether the increased work load performed by plaintiff and the increased stress from the heat stroke contributed or precipitated plaintiff's heart attack of July 2, 1975, Dr. Godley replied as follows:

"Well, Iordinarily I feel fairly strongly that heart attacks come on when they're going to come on and I've been very reluctant to assign a person's job as a cause of his heart attack. However, in this man's case I feel with reasonable certainty that it was an aggravating or precipitating factor because of the particular change in his work load that day. Ordinarilyand medical books will bear it outheart attack is caused by the development over a period of many years of sufficient hardening of the arteries to finally result in decreased flow of blood as I defined for a certain area of the heart muscle and a heart attack will take place. Precipitating factors are known, such as tobacco and heat and cold and diabetes, high blood pressure, anger, fear, exertion and that sort of thing. Ordinarily if a man is engaged at his same occupation doing the same thing and on a particular day has a heart attack, well it's a little difficult to say that job aggravated it or precipitated it. But if he's suddenly called upon to do far more than his usual occupation and without any forewarning himselfI was unable to determine by questioning him later that he had had any symptoms of heart disease prior to thisI feel like that in this particular instance why his work load was a definite precipitating factor on top of his atherosclerosis (sic) that he unknowingly developed." (P-3, pages 17, 18, 19).

STANDARD OF REVIEW
On appeal, defendant has placed the trial judge's findings of negligence, causation and damages at issue. It is appropriate at this point to outline the standard by which we have reviewed the issues in this matter. The scope of review by state appellate courts in reviewing federal statutory actions, such as FELA cases tried in state courts, is the same scope of review as is applicable in the federal court system. Trahan v. Gulf Crews, Inc., 260 La. 29, 225 So.2d 63 (1971); Broussard v. Missouri Pac. R. Co., 376 So.2d 532 (La.App. 3rd Cir. 1979).
The applicable standard of federal appellate review is prescribed in Rule 52(a)[3] of the Federal Rules of Civil Procedure and is set forth and discussed by Mr. Justice Reed *402 in United States v. United States Gypsum Co., 333 U.S. 364, 394-395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), as follows:
"That rule prescribes that findings of fact in actions tried without a jury `shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' . . . A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."
The mandate of Rule 52(a) also applies to mixed questions of law and fact. Determinations of negligence and contributory negligence by the trial judge in a federal action, as in the instant suit, are tested under the "clearly erroneous" rule. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Black v. Greyhound Corporation, 314 F.2d 485 (CA5th, 1963); Carrier v. United States, 369 F.2d 322 (CA5th, 1966) cert. denied, 386 U.S. 1027, 87 S.Ct. 1388, 18 L.Ed.2d 470; Bethlehem Steel Corp. v. Yates, 438 F.2d 798 (CA5th, 1971); Nelson v. Jacksonville Shipyards, Inc., 440 F.2d 668 (CA5th, 1971).

CONCLUSION
In the instant suit, we think the evidence, when considered most favorably to plaintiff-appellee and in view of our circumscribed standard of review, supports the trial judge's finding of negligence chargeable to defendant for not providing a sufficient and safe work force for the performance of the work required when measured by standards of due care commensurate to the danger of injury by collapse or heat prostration in light of the work conditions encountered.
Defendant's main argument against a finding of negligence, aside from the insufficiency of evidence, is that the occurrence of plaintiff's heart attack was unforeseeable because of his unknown arteriosclerotic condition; therefore, foreseeability being a necessary element of negligence, defendant was not negligent. We believe defendant misstates the issue. The foreseeable risk of harm created by defendant's negligence was that plaintiff would suffer a collapse or heat stroke, which in fact did occur. In this regard the record supports the trial judge's finding of causation in that, according to the medical evidence, the heart attack was a consequence of the increased strain on the heart caused by the heat stroke in combination with plaintiff's pre-existing condition of arteriosclerosis. Plaintiff's heart attack and resulting injuries, while perhaps unforeseeable, were consequential to the foreseeable harm suffered initially by defendant's negligence, i. e., collapse or heat prostration; therefore, defendant is liable in damages. As stated by the U.S. Supreme Court in Gallick v. Baltimore and Ohio Railroad Company, 372 U.S. 108, 83 S.Ct. 659, at 667, 9 L.Ed.2d 618 (1963):
"... It is widely held that for a defendant to be liable for consequential damages he need not foresee the particular consequences of his negligent acts: assuming the existence of a threshold tort against the person, then whatever damages flow from it are recoverable. See, e. g., Boal v. Electric Battery Co., 98 F.2d 815, 819 (C.A. 3d Cir.); Koehler v. Waukesha Milk Co., 190 Wis. 52, 57-63, 208 N.W. 901, 903-905 (collecting authorities); Restatement, Torts, § 435; 2 Harper and James, Torts, 1139-1140; Prosser, Torts, 260 (2d ed.); Seavey, Mr. Justice Cordozo and the Law of Torts, 48 Yale L.J. 390, 402-403. And we have no doubt that under a statute where the tort-feasor is liable for death or injuries in producing which his `negligence played any part, even the slightest' (Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493) such a tortfeasor must compensate his victim for even the improbable or unexpectedly severe consequences of his wrongful act. Cf. Kernan v. American Dredging Co., 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382; Coray v. Southern Pac. Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208; Lillie v. Thompson, 332 U.S. 459, 68 S.Ct. 140, 92 L.Ed. 73 . . ."
*403 Finally, as to damages, the trial judge had the benefit of the testimony of two experts as to future loss of wages, as well as other evidence of past loss of wages and general damages. Our review of the record reveals no abuse of discretion in the award of damages; nor can we say that the trial court was clearly erroneous in finding plaintiff free of contributory negligence and denying any diminution of damages. We conclude that the trial judge's findings are supported by the evidence in the record and the case's disposition, when viewed totally, does not require a reversal as being clearly erroneous.
Accordingly, for the above and foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against defendant-appellant.
AFFIRMED.
NOTES
[1] Federal Employers' Liability Act, 45 U.S.C. Sec. 51 reads as follows:

"Liability of common carriers by railroad, in interstate or foreign commerce, for injuries to employees from negligence; definition of employees
Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States or Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, truck, roadbed, works, boats, wharves, or other equipment.
Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."
[2] 45 U.S.C. Sec. 53 reads as follows:

"Contributory negligence; diminution of damages. In all actions [hereafter] brought against any such common carrier by railroad under or by virtue of any of the provisions of this [act (§§ 51-60 of this title)] to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee . . . ."
[3] F.R.Civ.P. Rule 52(a) provides:

"(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)."